# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALEX BÄCKER AND RICARDO BÄCKER, | § § § | No. 156, 2020 |
| Defendants Below, Appellants, | § § § | |
| v. | § § § | Court Below – Court of Chancery of the State of Delaware |
| PALISADES GROWTH CAPITAL II, L.P., | § § § | C.A. No. 2019-0931-JRS |
| Plaintiff Below, Appellee. | § § § § | |

Submitted: October 21, 2020
Decided: January 15, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED.**

Thomas A. Uebler, Esquire (*argued*), Joseph L. Christensen, Esquire, and Hayley M. Lenahan, Esquire, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Attorneys for Appellants Alex Bäcker and Ricardo Bäcker.*

Bradley R. Aronstam, Esquire (*argued*), Roger S. Stronach, Esquire, and Holly E. Newell, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Jon M. Talotta, Esquire, HOGAN LOVELLS US LLP, Tysons, Virginia; Michael C. Hefter, Esquire, HOGAN LOVELLS US LLP, New York, New York; *Attorneys for Appellee Palisades Growth Capital II, L.P.*

**MONTGOMERY-REEVES**, Justice:

Appellant Alex Bäcker is the co-founder and majority common stockholder of QLess, Inc. ("QLess" or the "Company"). In June 2019, the Company's board removed Alex as CEO following an internal investigation into workplace complaints.[1] Alex fought hard to keep his role as CEO, but eventually relented and expressed support for his successor, Kevin Grauman.

On November 15, 2019, QLess held a board meeting. In the week leading up to the meeting, the Company's outside counsel circulated board resolutions that, among other things, would appoint Grauman to the board. Alex made a series of statements that collectively represented support for Grauman's appointment.

On the eve of the board meeting, the Company's independent director unexpectedly resigned, giving Alex a board majority. Alex leapt into action, devising a secret counter agenda to fire Grauman and lock-in Alex's control of the Company. Alex caught his fellow directors by surprise at the meeting, passing his counter agenda over objections and seizing control of the Company.

Palisades Growth Capital II, L.P., the majority owner of the Company's Series A preferred stock, filed a complaint in the Court of Chancery seeking to reverse Alex's actions.

---

[1] After initially identifying individuals, this Court references surnames without honorifics or regard to formal titles such as "Doctor." The Court intends no disrespect. The Court also refers to Alex Bäcker and Ricardo Bäcker by their first names to avoid confusion. Again, the Court intends no disrespect and does not mean to suggest familiarity.

Following a paper trial, the court held that, even if technically legal, the board's actions were invalid as a matter of equity because Alex affirmatively deceived a fellow director to establish a quorum.

Appellants raise four primary issues on appeal. First, Appellants argue that the Court of Chancery's affirmative deception finding relied on clearly erroneous interpretations of the evidence. Second, Appellants argue that the court erred by imposing an equitable notice requirement for a regular board meeting, contrary to Delaware precedent. Third, Appellants argue that the deceived director's participation in the meeting precludes equitable relief. Fourth, Appellants argue that the court erred by exercising its equitable powers to grant relief for a *de facto* breach of a stockholder voting agreement.

Having reviewed the parties' briefs and the record on appeal, and after oral argument, this Court holds that the Court of Chancery's finding of affirmative deception was not clearly erroneous. The Court also holds that the Court of Chancery did not impose an equitable notice requirement for regular board meetings, that Appellants failed to properly raise an equitable participation defense below, and that the Court of Chancery did not exercise its equitable powers to grant relief for a *de facto* breach of contract claim. Accordingly, this Court affirms the Court of Chancery's March 26, 2020 Memorandum Opinion.

## I. BACKGROUND[2]

### A. The Parties and Relevant Non-Parties

QLess is a privately held Delaware corporation headquartered in California.[3] QLess produces and licenses a virtual queue management system that reduces the time that retail customers must wait in line for services.[4]

The Company has three primary stockholders: (i) Appellant Alex Bäcker, who owns the majority of the common stock, (ii) Respondent Palisades Growth Capital II, L.P. ("Palisades"), which owns the majority of the Series A preferred stock, and (iii) non-party Altos Hybrid 2 L.P. ("Altos"), which owns the majority of the Series A-1 preferred stock.[5] Under the Company's charter, the common stockholders have the exclusive right as a class to elect two directors.[6] The Series A and Series A-1 preferred stockholders each have the exclusive right as a class to elect one director.[7] The stockholders vote jointly on other board appointments.[8]

Alex co-founded QLess in 2009 and served as the Company's CEO until June 2019.[9] Alex, as the majority owner of the Company's common stock, controls two board seats and

---

[2] The Court takes the essential facts from the Court of Chancery's Memorandum Opinion. *Palisades Growth Cap. II, L.P. v. Backer*, 2020 WL 1503218 (Del. Ch. Mar. 26, 2020).
[3] *Id.* at *3.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *See* Appendix to the Opening Br. 47-48 (hereafter "A__").
[9] *Palisades*, 2020 WL 1503218, at *3.

appointed himself as a board member.[10]  Alex also appointed his father, Appellant Ricardo Bäcker, to the board in early 2019 to replace Michael Bell.[11]

Palisades is a private equity firm that first invested in QLess in August 2017.[12] Palisades, as the majority owner of the Company's Series A preferred stock, appointed Jeff Anderson, a partner of Palisades, to the board in 2017.[13]

Altos is an investment firm that first invested in QLess in November 2018.[14]  Altos, as the majority owner of the Company's Series A-1 preferred stock, appointed Hodong Nam, co-founder of Altos, to the board in 2018.  Nam resigned from the QLess board in September 2019.[15]  After resigning, Nam chose Paul D'Addario, a Senior Managing Director of Palisades, as his replacement on the board.[16]

Ivan Markman served as the Company's independent director from November 2018 until he resigned in November 2019.[17]

Paul Alderton is the Company's outside counsel.[18]

---

[10] *Id.* at *1, *3.
[11] *Id.* at *3.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at *4.

Patricio Cuestra is the consultant that Alex and Ricardo purported to appoint as a common director during the November 15, 2019 board meeting.[19]

Kevin Grauman was hired as the Company's CEO in September 2019 and purportedly was terminated during the November 15, 2019 board meeting.[20]

## B.  The Board Terminates Alex Bäcker as CEO

In early 2019, QLess employees began reporting to the board that Alex's leadership style was creating a toxic work environment.[21]  According to some senior executives, Alex was becoming "increasingly withdrawn and unhinged, either totally absent and disconnected or hyper micromanaging and combative."[22]

At that time, the Company's board was composed of five directors:  Alex (common director), Michael Bell (common director), Anderson (Series A director), Nam (Series A-1 director), and Markman (independent director).[23]  The board grew concerned that the Company could suffer a mass employee exodus.[24]  Those concerns intensified when Alex terminated the Company's Vice President of Engineering in March 2019, frustrating investors.[25]

---

[19] *Id.* at *5, *5 n.60.
[20] *Id.* at *3.
[21] *Id.*
[22] *Id.*; *see also* Appendix to Answering Br. 1 (hereafter "B__").
[23] *See Palisades*, 2020 WL 1503218, at *3-4.
[24] *Id.* at *3.
[25] *Id.*

5

Anderson thought that the board should terminate Alex as CEO.[26]  Nam and Markman were hesitant to remove Alex as CEO and proposed the intermediate step of hiring outside consultants to provide coaching and counseling.[27]  At Nam's request, Alex and the board met with two outside management consultants.  The meeting was not productive, leading a majority of the directors to conclude that the board should remove Alex as CEO.  Nam told Alex that he should resign.[28]

Three days later, Nam and Anderson called a special board meeting to discuss Alex's status with the company.[29]  Unwilling to resign, Alex sought to secure his position as CEO by firing the Company's President and Corporate Secretary, and by replacing Bell—who now supported terminating Alex—with Alex's father, Ricardo.[30]  Now Anderson and Nam favored terminating Alex as the CEO; the Bäckers were both opposed; and Markman was undecided.  Thus, efforts to terminate Alex stalled.[31]

After weeks of increasing employee unrest, the board voted to form a Special Committee—consisting of Anderson, Nam, and Markman—to investigate the complaints against Alex.  The Special Committee hired an outside law firm to conduct an internal investigation.[32]

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* at *4.
[30] *Id.*
[31] *Id.*
[32] *Id.*

In May 2019, the outside law firm completed its investigation and sent a report to the Special Committee.[33]  The report substantiated many of the employee complaints against Alex.  In response, the Special Committee recommended that the full board terminate Alex.[34]

On June 8, 2019, the board met and voted to remove Alex as CEO.[35]  The board's decision to terminate Alex triggered provisions in the charter and a stockholder agreement that could collectively reduce Alex's control of QLess.  Among other things, the stockholders had agreed that if Alex ceased to be CEO, the stockholders would vote to expand the board to six seats and appoint the replacement CEO to the board.[36]

## C.  The Events Leading up to the November 15 Board Meeting

After terminating Alex, the board launched an extensive search to select a new CEO.[37]  The search eventually focused on Grauman, and the board hired Grauman as CEO on September 7, 2019.[38]  Alex initially expressed support for Grauman's appointment as CEO, but their relationship quickly soured as Grauman sensed that Alex wanted to reclaim his former role as CEO.

On September 30, 2019, Nam resigned as the Series A-1 director, leaving the seat vacant.[39]  At that time, the Company's five-seat board was composed of four directors: Alex

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *See* A67-69.
[37] *See Palisades*, 2020 WL 1503218, at *4.
[38] *Id.*
[39] *Id.* at *5; *see also* B56.

(common director), Ricardo (common director), Anderson (Series A director), and Markman (independent director).

Anderson reached out to Nam about filling the empty seat, seeking to appoint D'Addario from Palisades to temporarily serve as the Series A-1 director.[40] After considering some alternatives, Nam agreed and (through counsel) asked Alderton, outside counsel to QLess, to "draft and circulate the necessary stockholder consent to elect Paul D'Addario . . . to the QLess Board as the Altos designee[.]"[41]

Unfortunately, Alderton seems to have misunderstood the charter.[42] Although the charter allows the Series A-1 stockholders to elect a replacement director by unanimous consent, Alderton told Nam,

> Your appointment is contractual, in other words you have the contractual right to designate who the Series A-1 director will be, but that person still needs to be either elected by the stockholders under Delaware law, or in this case since it is filling a vacancy, appointed by the Board.[43]

Nam responded:

> Got it. From a mechanics perspective it's easier to appoint with board approval. For some strange reason if the board does not approve [the D'Addario appointment] then we can do it the hard way. Why do it the hard way when it's simple to do with board consent. Is that correct?[44]

---

[40] *Palisades*, 2020 WL 1503218, at *4.
[41] *Id.*; A178.
[42] *Palisades*, 2020 WL 1503218, at *4.
[43] A179.
[44] *Id.*

Thus, Nam and Anderson decided to wait until the next board meeting to formally appoint D'Addario to the board.[45]

On October 27, 2019, Alex sent the Company's directors an email seeking to schedule the next board meeting.[46] Anderson realized that Grauman did not appear to be on the scheduling email thread and asked why he was left off. In response, Alex sent an email stating, "Kevin is on the thread, assuming bod now includes him, which I requested it does. Kevin, can you please confirm you received this?"[47] The parties agree that "bod" referred to the board's email listserv, a single email address that would automatically distribute messages to other recipients included on a distribution list.[48] The "bod" distribution list included all of the Company's directors and Alderton,[49] the Company's outside general counsel who sometimes acted as the board secretary.[50] The directors ultimately agreed to hold a board meeting on November 15.[51]

---

[45] *Palisades*, 2020 WL 1503218, at *4.
[46] *Id.* at *5.
[47] *Id.*; A172.
[48] Opening Br. 25-28; Answering Br. 9.
[49] A824, at 97:2-98:21.
[50] *See, e.g.*, A289 (minutes from the November 15 board meeting noting that "Mr. Alderton served as Secretary of the meeting.").
[51] *Palisades*, 2020 WL 1503218, at *5.

On November 11, 2019, Grauman circulated a high-level agenda for the November 15 board meeting.[52] Alex thanked Grauman for the agenda and requested that he "circulate any proposed resolutions at least 48 hours before the meeting for review[.]"[53]

Alderton responded to Alex's request on November 13, attaching proposed board resolutions that, among other things, would: (i) appoint D'Addario as the Series A-1 director, (ii) ratify Grauman's appointment as CEO, (iii) increase the board to six members, and (iv) appoint Grauman to the new CEO director seat.[54] The Bäckers did not object to the proposed resolutions, although Alex requested that Alderton add an option grant for Ricardo that the board had previously discussed.[55]

The same day, Alex communicated with Nam about appointing someone other than D'Addario, and not from Palisades, to the vacant Series A-1 board seat.[56] Nonetheless, Nam decided to nominate D'Addario.[57]

On the morning of November 14, Markman unexpectedly resigned from his position as independent director, leaving the Company with only three directors: Alex, Ricardo, and Anderson.[58] Markman told Grauman that the "[o]ne liner" explanation for Markman's

---

[52] *Id.*
[53] B65.
[54] *Id.*
[55] *See* A211; *see also Palisades*, 2020 WL 1503218, *5.
[56] *See, e.g.*, A202-03; *see also Palisades*, 2020 WL 1503218, at *4 n.46 ("Although Nam did initially discuss other options with Bäcker, he quickly settled on D'Addario as his choice.").
[57] *Palisades*, 2020 WL 1503218, at *4 n.46
[58] *Id.* at *5.

resignation was "not enough time."[59] That was not the full story. Markman decided to resign after a phone call with Alex led Markman to believe that Alex would try to reinstate himself as the Company's CEO.[60]

Alex recognized that Markman's resignation—combined with Nam's earlier resignation—gave the Bäckers a two-vote majority on a three-member board. Thus, Alex began working on a secret counter agenda to fire Grauman and seize control of QLess. Nonetheless, a few hours after Markman's resignation, Alex emailed the board and asked Grauman to "distribute the board materials/deck a day in advance of the meeting so that we may all do our homework and be prepared to spend our time together most productively."[61] Alex did not disclose his intention to fire Grauman and take control of the Company.

Anderson and Alderton appear to have recognized that Alex could use Markman's resignation to take aggressive action and that the Bäckers needed Anderson's attendance to establish a quorum.[62] Nonetheless, Anderson and Alderton concluded that the Bäckers would not be able to exercise majority control because the voting agreement compelled the Bäckers to vote in favor of D'Addario's appointment, which would be the first item on the board's agenda, preventing the Bäckers from forcing any other board actions over objections from Anderson and D'Addario.[63]

---

[59] A243; *see also Palisades*, 2020 WL 1503218, at *5.
[60] *Palisades*, 2020 WL 1503218, at *5.
[61] A207.
[62] *See, e.g.*, A639, at 161:6-162:7.
[63] *See, e.g.*, A627, at 114:10-115:12.

### D. Alex Seizes Control of the Company

During the early afternoon of November 15, Alex shared a set of alternative board resolutions with Ricardo and Cuestra, a consultant that Alex intended to appoint to the board.[64] The alternative resolutions differed dramatically from the resolutions Alderton circulated two days earlier. Among other things, Alex's alternative resolutions would: (i) terminate Grauman as CEO, (ii) appoint Alex as CEO and CFO, (iii) expand the board to six members and appoint Alex to the new CEO-director seat, (iv) appoint Cuestra to the common director seat that Alex vacated, and (v) amend the bylaws to allow three directors (*e.g.*, Alex, Ricardo, and Cuestra) to constitute a quorum.[65] Taken as a whole, the alternative resolutions would effectively lock-in Alex's control of QLess. Alex did not share his alternative resolutions with Anderson, D'Addario, Alderton, Nam, or Markman.

Several hours later, but still before the board meeting, Alderton emailed the Bäckers to follow-up on the board resolutions circulated earlier in the week.[66] Alderton noted that the Bäckers had not electronically signed a board consent adopting the resolutions and stated that "[i]t is my understanding from Jeff [Anderson] that execution of this Consent prior to the Board meeting is a prerequisite, and that he will not be joining the call if it is not signed in advance, which would leave us without a quorum and thus unable to conduct business."[67]

---

[64] *Palisades*, 2020 WL 1503218, at *5.
[65] *Id.*
[66] *See* A263.
[67] *Id.*

The proposed board resolutions were largely unchanged from the resolutions that Alderton circulated earlier in the week and would, among other things, ratify Grauman's employment and appoint both D'Addario and Grauman to the board.

After coordinating, the Bäckers decided to ignore the ultimatum and did not sign the consent approving the board resolutions.[68] Despite not receiving a response from the Bäckers, Anderson decided to attend the board meeting.

Later that evening, the board held the planned meeting. Alex called the meeting to order and asked that Grauman and D'Addario leave the meeting.[69] Grauman left the meeting. D'Addario refused to leave. Alex and Ricardo then unveiled and executed their counter agenda, firing Grauman as CEO, hiring Alex as CEO and CFO, appointing Alex to the newly created CEO-director seat, appointing Cuestra to the common director seat that Alex left vacant, and changing the quorum bylaw. Anderson and D'Addario stayed and objected to each board action.[70]

At the end of the meeting, the board was composed of four directors: (i) Cuestra (common), (ii) Ricardo (common), (iii) Anderson (Series A), and (iv) Alex (CEO), with both the Series A-1 and independent director seats vacant.[71] This board composition effectively

---

[68] *See* B118-21.
[69] *Palisades*, 2020 WL 1503218, at *5.
[70] *Id.*
[71] *Id.*

locked in Alex's control of QLess by allowing Alex, Ricardo, and Cuestra to establish a quorum and exercise majority board control.

The Court of Chancery characterized the Bäckers' actions at the November 15 board meeting as an "ambush" and a "coup,"[72] and the record suggests that the Bäckers caught the other directors by surprise. For example, three days after the board meeting, Nam sent an email to Anderson recounting communications that Nam had with Alex leading up to the board meeting. According to Nam,

> [Alex] texted me after Ivan [Markman] resigned and asked me if I heard anything (via text). He claimed to have no idea what happened.
>
> When I did speak to [Alex] about a week ago, I specifically asked him how he thought Kevin [Grauman] was doing. I also asked him how the relationship was between him and Kevin. He said everything was fine. He offered absolutely zero clue to any problems or dissatisfaction he had with Kevin [Grauman] as CEO.[73]

Thus, Nam and Anderson both appear to have been unaware of Alex's plan to reclaim his role as CEO, although it is unclear when the conversation between Alex and Nam occurred.[74]

---

[72] *Id.* at *9-10.

[73] A301.

[74] *See, e.g.*, A738, at 242:21-244:18 (Nam testifying that he recalled having "two conversations with Alex" around November 12th, one of which seems to have been the conversation that Nam recalled in the email quoted above).

14

**E.    The Court of Chancery Invalidates the November 15 Board Actions**

On November 20, 2019, Palisades filed a complaint in the Court of Chancery, challenging the Bäckers' actions at the November 15 board meeting.[75]   The complaint alleged four counts.  Count I sought a declaratory judgment under 8 *Del. C.* § 225 that the QLess board consisted of Anderson, D'Addario, Alex, and Ricardo.  Count II sought a similar declaratory judgment under § 225 that Grauman is the Company's CEO.  Count III sought specific performance of the voting agreement, which would entail electing Grauman to the CEO director seat.  Count IV alleged that the Bäckers breached their fiduciary duties.[76] In November 2019, the Court of Chancery agreed to bifurcate the breach of fiduciary duty claim from the summary § 225 proceeding addressing the first three counts.[77]

The Court of Chancery held a trial on the papers in January 2020.[78]  Afterwards, the court requested two rounds of post-trial briefing on technical issues related to the Company's corporate governance documents, such as whether the board's decision to remove Alex as CEO in June 2019 automatically triggered an obligation to expand the board to six members and whether advance notice was required to amend the quorum bylaws.[79]

---

[75] A304.
[76] *Palisades*, 2020 WL 1503218, at *5.
[77] *See* B122, B126.
[78] A1250.
[79] B202, A1405.

The Court of Chancery issued its memorandum opinion on March 26, 2020.[80] The court held that "D'Addario was never validly appointed to the board,"[81] and "while [Alex] and Ricardo were not forthcoming with Palisades and Altos in advance of the November 15 meeting, they did not take any affirmative action to prevent Altos from exercising its rights" to appoint D'Addario.[82]

The court also observed that

> it is not at all clear that [Alex] Bäcker breached the Voting Agreement by refusing to recognize Grauman as a duly appointed member of the Board. While the evidence clearly demonstrates that the parties to the Voting Agreement intended that Grauman would take the newly created CEO Board seat in advance of the November 15 meeting, the specific means by which that Board vacancy was to be filed are not at all clear in either the Bylaws or the Voting Agreement itself.[83]

Nonetheless, the court invalidated the board's actions at the November 15 meeting because the Bäckers affirmatively deceived Anderson to establish a quorum.[84] The court explained that

> there must be *some* affirmative deception before equity will intervene; if the Bäckers had simply acted in secret to plot their boardroom *coup d'état* without any affirmative action to mislead the other members of the Board, Plaintiff's call to equity would rest on softer ground.

---

[80] *Palisades*, 2020 WL 1503218, at *1.
[81] *Id.* at *2.
[82] *Id.*
[83] *Id.*
[84] *Id.* at *9-10.

16

But that is not what Defendants did. . . . Altos was the recipient of some erroneous legal advice and [Alex] Bäcker sat silently on the misinformation. If that were the end of the story, there would be no basis to invoke equity. But the Bäckers did not stay silent in all matters related to the November 15 meeting. Instead, [Alex] Bäcker affirmatively misrepresented to Anderson and others that he wanted Grauman on the Board, and that he assumed Grauman had already joined the Board . . . .

. . . After having affirmatively represented to Anderson (and Markman) that Defendants supported Grauman's appointment to the Board, keeping mum as they planned their ambush was inequitable. If Anderson had known of Defendants' change of plans, he would have refused to participate in the meeting, defeating a quorum and thwarting the coup. As Anderson's presence at the meeting was secured under deliberately false pretenses, any action taken at that meeting is void.[85]

The Court of Chancery relied on six pieces of evidence to find that the Bäckers affirmatively deceived Anderson. First, the court found that the scheduling email Alex sent the board in October 2019 "affirmatively misrepresented to Anderson and others that [Alex] wanted Grauman on the Board, and that [Alex] assumed Grauman had already joined the Board."[86] The court quoted the relevant portion of that email as follows: "Kevin [Grauman] is on the thread, assuming [the Board] now includes him, *which I requested it does*."[87] The court also noted that Ricardo responded to the scheduling email by writing "[l]ooks good to me."[88] Although the court does not explicitly state the relevance of this statement, it seems

---

[85] *Id.*
[86] *Id.* at *10.
[87] *Id.*
[88] *Id.*

to have construed Ricardo's response to endorse Alex's request that Grauman be added to "[the Board]."[89]

Second, the court observed that "[w]hen Grauman circulated a 'high-level agenda' for the November 15 meeting, [Alex] Bäcker responded by thanking [Grauman] and asking him to 'circulate any proposed resolutions'" for the meeting.[90] The court found that this statement "gav[e] the impression that [Alex] Bäcker had no issue with Grauman joining the Board."[91]

Third, the court noted that "[o]n the day before the contested meeting, [Alex] Bäcker emailed Grauman, copying the QLess Board, requesting that Grauman circulate board materials 'so that *we* may all do *our* homework and be prepared to spend *our* time together most productively.'" The court found that this message "g[ave] the impression that [Alex] Bäcker approved of Grauman's board membership."[92]

Fourth, the court recalled that

> [w]hen Alderton circulated draft Board resolutions that would formalize Grauman's appointment to the Board, as requested by Grauman and [Alex] Bäcker, neither Ricardo nor [Alex] gave any indication that their position had changed. After having affirmatively represented to Anderson (and Markman) that Defendants supported Grauman's appointment to the Board, keeping mum as they planned their ambush was inequitable.[93]

---

[89] *See id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*

Fifth, the court cited to an email that Nam authored a few days after the November 15 board meeting stating that "[w]hen I did speak to [Alex] [Bäcker] about a week ago, I specifically asked him how he thought Kevin [Grauman] was doing. I also asked [Alex] how the relationship was between him and [Grauman]. [Alex] said everything was fine."[94]

Sixth, the court found that Grauman "understood" the October 2019 scheduling email "to mean that he was now a member of the board," citing the following testimony from Grauman's deposition:

> Q. If you could direct your attention to Alex Bäcker's email . . . on October 28th . . . .
>
> A. Yes.
>
> Q. He says: Kevin is on the thread, assuming BOD now includes him, which I requested it does.
>
> A. Correct.
>
> Q. What does that mean?
>
> A. "BOD" is Board of Directors. So Alex is basically saying to the other members of the Board that he's added me to the thread of communications with the Board members, assuming that I'm now on the Board.
>
> Q. What did that indicate to you, if anything, about your participation at the Board level?
>
> A. It indicated that there was a follow-through in exactly the same way as I was expecting and what had been discussed before, that I would occupy the CEO's seat on the Board.[95]

---

[94] *Id.* at \*10 n.116.
[95] A812-13, at 52:11-53:5.

Relying on the evidence discussed above, the court found that "Anderson's presence at the meeting was secured under deliberately false pretenses."[96] "If Anderson had known of [the Bäckers'] change of plans, he would have refused to participate in the meeting, defeating a quorum and thwarting the coup."[97]

On April 22, 2020, the Bäckers filed a timely notice of appeal. On appeal, the Bäckers argue that the Court of Chancery erred by relying on clearly erroneous interpretations of evidence and applying incorrect legal standards to invalidate the actions that the Bäckers took at the November 15 board meeting.

## II. STANDARD OF REVIEW

"This Court reviews questions of law *de novo*."[98] "[T]he applicable standard by which the defendants' conduct is to be judged . . . is a legal question . . . subject to *de novo* review by this Court."[99]

"We will not overturn the Court of Chancery's factual findings unless they are clearly erroneous."[100] The clearly erroneous standard of review is deferential to the trial court. "We

[96] *Palisades*, 2020 WL 1503218, at *10.
[97] *Id.*
[98] *Klassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014) (citing *DV Realty Advisors LLC v. Policeman's Annuity and Benefit Fund of Chi.*, 75 A.3d 101, 108 (Del. 2013)); *see also Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 9 (Del. 2020) ("This Court reviews errors of law *de novo*." (citing *SmithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 447 (Del. 2000))).
[99] *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993) (citing *Fiduciary Tr. Co. v. Fiduciary Tr. Co.*, 445 A.2d 927, 930 (Del. 1982)).
[100] *Klassen*, 106 A.3d at 1043 (citing *DV Realty*, 75 A.3d at 108).

will not set aside a trial court's factual findings 'unless they are clearly wrong and the doing of justice requires their overturn.'"[101]  Factual findings are not clearly erroneous "if they are 'sufficiently supported by the record and are the product of an orderly and logical deductive process.'"[102]  "The factual findings of a trial judge can be based upon physical evidence, documentary evidence, testimonial evidence, or inferences from those sources jointly or severally."[103]  "That deferential standard applies not only to historical facts that are based upon credibility determinations but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts      ."[104]  "When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[105]

"'Whether . . . an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*,' but . . . 'application of those facts to the correct legal standards . . . are reviewed for an abuse of discretion.'"[106]

---

[101] *DV Realty*, 75 A.3d at 108 (quoting *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 219 (Del. 2005)).

[102] *Biolase, Inc. v. Oracle P'rs*, 97 A.3d 1029, 1035 (Del. 2014) (quoting *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999)).

[103] *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000).

[104] *CDX Hldgs., Inc. v. Fox*, 141 A.3d 1037, 1041 (Del. 2016).

[105] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015) (quoting *Bank of N.Y. Mellon Tr. Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011)).

[106] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341 (Del. 2013) (quoting *Schock*, 732 A.2d at 232).

## III. ANALYSIS

On appeal, the Bäckers argue that the Court of Chancery's opinion should be reversed for four reasons. First, the Bäckers argue that the court's "finding of affirmative deception was based on a clearly erroneous rewriting and interpretation of a trial exhibit . . . that even Palisades did not proffer."[107] Because "Alex and Ricardo's communications cited by the Court of Chancery were not deceitful and did not deceive Anderson into attending the November 15 Meeting, [e]quity . . . cannot invalidate Alex and Ricardo's votes at the meeting."[108] Second, the Bäckers argue that the court "imposed an equitable advance-notice requirement for regular, as opposed to special, Board meetings," contrary to Delaware precedent.[109] Third, the Bäckers argue that "the affirmative-deception rule" in *Koch v. Stearn* does not apply to regular board meetings, and that Anderson's decision to participate in the November 15 board meeting and vote against all matters presented forecloses equitable relief.[110] Fourth, the Bäckers argue that "it was reversible error to award extracontractual relief supplanting the Voting Agreement where the contract was not breached and contains its own enforcement mechanism."[111]

We address each argument in turn.

---

[107] Opening Br. 4.
[108] *Id.*
[109] *Id.*
[110] Opening Br. 44 (referring to 1992 WL 181717 (Del. Ch. July 28, 1992), *overruled on other grounds by Klassen v. Allegro Dev. Corp.*, 106 A.3d 1035 (Del. 2014)).
[111] *Id.* at 47.

### A. The Court of Chancery's Finding that the Bäckers Deceived Anderson Was Not Clearly Erroneous

The Court of Chancery held that the board's actions at the November 15 meeting were invalid as a matter of equity because the Bäckers affirmatively deceived Anderson to establish a quorum.[112] The Bäckers argue that the court's finding of affirmative deception is a mixed question of fact and law that we should review *de novo*.[113] The Bäckers next argue that even if this Court applies the clearly erroneous standard of review, the Court of Chancery's finding of affirmative deception was clearly erroneous because the evidence does not show the Bäckers affirmatively deceived Anderson.[114] Finally, the Bäckers contend that Palisades did not properly raise any theory of affirmative deception as to Grauman's appointment, and therefore the court erred by granting equitable relief relating to Grauman's appointment.[115]

### 1. We review the Court of Chancery's factual finding of affirmative deception for clear error

We ordinarily review a trial court's factual findings for clear error.[116] Nonetheless, the Bäckers argue that the Court of Chancery's determination that they affirmatively deceived Anderson is a mixed question of fact and law that we review *de novo*.[117] The

---

[112] *Palisades*, 2020 WL 1503218, at *9-10.
[113] Opening Br. 23.
[114] *Id.* at 4.
[115] *Id.* at 35-37.
[116] *See, e.g.*, *Klassen*, 106 A.3d at 1043.
[117] Opening Br. 23; Reply Br. 7-8.

Bäckers reason that, because the Court of Chancery stated that affirmative deception was a prerequisite for equitable relief in this case, the court's finding that the Bäckers affirmatively deceived Anderson was an application of law to facts presenting a mixed question of fact and law.[118]

We disagree with the Bäckers. At bottom, the determination of whether the conduct was deceptive was a factual one. Unlike the mixed questions of fact and law that the Bäckers identify, the court did not need to consider legal principles to determine whether the Bäckers tricked Anderson. Instead, the court had to answer two factual questions. First, what representations did the Bäckers make? Second, were those representations false or misleading? The record supplied full answers to both questions. The Court of Chancery's use of the words "affirmative" and "deception" simply describe the factual scenario that justified equitable intervention: directors misleading a fellow director. Thus, the court's finding that the Bäckers affirmatively deceived Anderson is a factual finding that we review for clear error, not a mixed question of fact and law.

### 2. The Court of Chancery's finding of affirmative deception was not clearly erroneous

As discussed above, the court held that even if the Bäckers complied with the technical requirements under the Company's corporate governance documents, the board's

---

[118] *See* Reply Br. 7-8.

24

actions were nonetheless invalid under equitable principles because the Bäckers affirmatively deceived Anderson to create a quorum.[119]

This Court has long recognized that "inequitable action does not become permissible simply because it is legally possible."[120] Under Delaware law, "director action[s] [are] 'twice-tested,' first for legal authorization, and second [for] equity."[121] "Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with *equitable* principles of fiduciary duty."[122] For this reason, Delaware courts "review issues that could infect the composition of a company's '*de jure* directors and officers' under Section 225, notwithstanding formal compliance with the voting procedures and requirements for those offices."[123]

Consistent with these principles, Delaware courts have used their equitable powers on numerous occasions to invalidate otherwise lawful board actions tainted by inequitable deception. For example, in *Koch v. Stearn* the court invalidated board actions terminating a CEO where a fellow director "tricked [the CEO] into attending the meeting" by circulating a special meeting notice that was "silent as to any possible consideration of" a transaction

---

[119] *Palisades*, 2020 WL 1503218, at *9-10.

[120] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

[121] *In re Invs. Bancorp., Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017) (quoting *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007)).

[122] *Sample*, 914 A.2d at 664 (emphasis added).

[123] *Brown v. Kellar*, 2018 WL 6721263, at *6-7 (Del. Ch. Dec. 21, 2018) (quoting *Genger v. TR Invs., LLC*, 26 A.3d 180, 200 (Del. 2011)).

that would cause the board to remove the current CEO.[124]  Further, the company's outside directors intentionally failed to disclose their "agenda, which included removing [the CEO] from office if he did not cooperate and step down voluntarily."[125]  Similarly, in *Alderstein* the court invalidated a board vote terminating the CEO and issuing stock "with the purposeful effect of destroying his voting control" where the other directors "all operated in secret to negotiate terms" for the dilutive transaction "while keeping [the CEO] deliberately uninformed about their plan to present [that] proposal."[126]

Proof of an outright lie is not necessary to justify equitable remedies.  Deceptive omissions can suffice.  For example, in *Koch* the court held that directors deceived the CEO by providing the CEO with a meeting agenda that intentionally omitted discussion of the transaction that led to the CEO's termination.[127]  The court also held that the CEO could be "tricked into attending the meeting" even though he "may have had some reason to suspect that his removal from office would be discussed."[128]

Likewise, in *Optimiscorp v. Analog Ventures*, despite affirming the Court of Chancery's holding on other grounds, this Court observed,

> [W]e are reluctant to accept the notion that it vindicates the board's right to govern the corporation to encourage board

---

[124] *Koch v. Stearn*, 1992 WL 181717, at *5 (Del. Ch. July 28, 1992), *overruled on other grounds by Klassen*, 106 A.3d at 1047.

[125] *Id.*

[126] *Alderstein v. Wetheimer*, 2002 WL 205684, at *8-9 (Del. Ch. Jan. 25, 2002) (internal quotation marks omitted).

[127] *Koch*, 1992 WL 181717, at *5.

[128] *Id.*

26

factions to develop Pearl Harbor-like plans to address their concerns about the company's policy directions or the behavior of management. Rather, it has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information.[129]

The Bäckers argue that the Court of Chancery's affirmative deception finding was clearly erroneous because the evidence does not show that the Bäckers falsely represented support for Grauman's appointment.[130] The Bäckers' core argument is that the Court of Chancery adopted "a clearly erroneous rewriting and interpretation" of the scheduling email that Alex sent the board in October 2019 to find that the Bäckers affirmatively represented support for Grauman's appointment.[131] In the original email, Alex wrote that "Kevin is on the thread, assuming **bod** includes him, which I requested it does."[132] The parties agree,[133] and the record reflects,[134] that "bod" referred to the board's email distribution list. The Court of Chancery replaced "**bod**" with "[**the Board**]" when quoting the message.[135] The Bäckers

---

[129] *Optimiscorp v. Waite*, 137 A.3d 970, 2016 WL 2585871, at *3 (Del. Apr. 25, 2016) (Table) (citations omitted).

[130] Opening Br. 4.

[131] *See, e.g.*, *id.* at 4, 25-29.

[132] A172 (emphasis added).

[133] *See, e.g.*, Opening Br. 26-27 ("The reference to 'bod' was to Grauman being 'on the email thread' by virtue of being on the 'bod' email distribution list," which referred to "'the Company's Board listserv.'" (quoting A1224)); Answering Br. 20 ("[T]he Bäckers focus on the Court of Chancery's interpretation of . . . (A172), an email in which [Alex] Bäcker states that he 'requested' that Grauman be 'added' to 'bod,' a Board listserv.").

[134] *See, e.g.*, A812, at 52:15-23 (Grauman testified during his deposition that "'BOD' is Board of Directors. So Alex is basically saying to the other members of the Board that he's added me to the thread of communications with the Board members, assuming that I'm now on the Board.").

[135] *Palisades*, 2020 WL 1503218, at *10 (emphasis added).

argue that this "textual alteration . . . made a substantive, material change to the evidence. The original text of [the scheduling email] had nothing to do with the composition of the Board . . ., and the reference to 'bod' was not a reference to Grauman being a director."[136]

Thus, the Bäckers argue that the Court of Chancery misconstrued Alex's request. In the original email, Alex referred to a request that Grauman be added to the board's email distribution list. Misreading "bod" to refer to "[the Board]," the court wrongly concluded that Alex referenced a request to add Grauman to the Company's board of directors. The court then relied on that incorrect reading to find that the Bäckers made statements that were deceptively incomplete given Alex's earlier request to add Grauman to the Company's board of directors. The Bäckers also argue that the Court of Chancery relied on this misinterpretation to find that Ricardo's represented support for Grauman's appointment by responding "[l]ooks good to me" to Alex's email.[137]

The Bäckers' concern has some merit. The court's replacement of "bod" with the capitalized term "the Board" suggests that the court construed Alex's request to refer to the Company's board of directors, not the board's email distribution list.[138] Further the court characterized the scheduling email as "expressing [Alex's] belief that Grauman had been added to **the Board**, per his request."[139]

---

[136] Opening Br. 26.
[137] *Id.* at 30.
[138] *See Palisades*, 2020 WL 1503218, at *10.
[139] *Id.* at *9 n.107 (emphasis added).

28

Nonetheless, Alex's request to add Grauman to the board's distribution list was consistent with appointing Grauman to the CEO-director seat. The purpose of the "bod" listserv appears to have been to facilitate communications among the members of the QLess board.[140] It also appears that the distribution list included only the current members of the board and Alderton,[141] the Company's outside counsel who sometimes acted as the corporate secretary during board meetings.[142] Requesting that Grauman be added to the board's email distribution list, therefore, is consistent with the intent to add Grauman to the Company's board of directors at the November 15 board meeting.

Further, Grauman's testimony supports this interpretation, as he thought Alex's request to add him to the "bod" listserv "indicated that there was a follow-through in exactly the same way as I was expecting and what had been discussed before, that I would occupy the CEO's seat on the Board."[143] The Bäckers try to discount this testimony by citing other testimony indicating that Grauman "did not believe he was a director before the November

---

[140] *See, e.g.*, A812, at 52:19-23 (testimony from Grauman's deposition: "'BOD' is Board of Directors. So Alex is basically saying that he's added me to the thread of communications with the Board members, assuming that I'm now on the Board.").

[141] *See, e.g.*, A172 (this email thread sent to the bod listserv shows emails sent by Anderson, Markman, Alderton, Alex, and Ricardo); A824, at 97:18-98:12 (testimony from Grauman's deposition: "Q. You didn't infer from this email [A172] that you were a member of the Board of Directors, did you? A. I didn't infer anything from this email. Q. If you look at the very top, there's an email address that's . . . bod@qless.com. Do you see that? . . . Looking at it now, you understand, don't you, that Alex was referring to a Board distribution list? A. Yeah, I do. But that could have included Scott [Alderton], too. He's not on the Board of Directors.").

[142] *See, e.g.*, A289 ( "Mr. Alderton served as Secretary of the meeting.").

[143] A813, at 53:2-5.

29

15 Meeting."[144] This argument does not withstand scrutiny, however, because Grauman's testimony that he did not think that he was a director *before* the November 15 board meeting does not mean that he did not think that he would be named a director *at* the meeting. Further, even if the Bäckers cited to contradictory testimony, the court's "choice" between "two permissible views of the evidence . . . cannot be clearly erroneous."[145]

Nonetheless, if the Court of Chancery relied on its interpretation of the scheduling email *alone* to find deception, we might hold that the court's finding was clearly erroneous. But that is not so. The court found that the Bäckers made four more misrepresentations regarding Grauman's appointment:

- "When Grauman circulated a 'high-level agenda' for the November 15 meeting, [Alex] Bäcker responded by thanking [Grauman] and asking him to 'circulate any proposed resolutions'" for the meeting.[146]

- "On the day before the contested meeting, [Alex] Bäcker emailed Grauman, copying the QLess Board, requesting that Grauman circulate board materials 'so that *we* may all do *our* homework and be prepared to spend *our* time together most productively.'"[147]

- "When Alderton circulated draft Board resolutions that would formalize Grauman's appointment to the Board, as requested by Grauman and [Alex] Bäcker, neither Ricardo nor [Alex] gave any indication that their position had changed."[148]

---

[144] *See* Opening Br. 28 (citing A835, at 142:5-9).

[145] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015) (quoting *Bank of N.Y. Mellon Tr. Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011)).

[146] *Palisades*, 2020 WL 1503218, at *10 (referring to B65).

[147] *Id.* (quoting A207).

[148] *Id.* (quoting A211).

- A few days after the November 15 board meeting, Nam sent an email stating that "[w]hen I did speak to [Alex] [Bäcker] about a week ago, I specifically asked him how he thought Kevin [Grauman] was doing. I also asked [Alex] how the relationship was between him and [Grauman]. [Alex] said everything was fine."[149]

The Bäckers claim that none of these statements show that the Bäckers represented support for Grauman's appointment. Regarding the first misrepresentation, the Bäckers claim that the high-level agenda Grauman circulated did not "mention . . . Grauman's appointment" and "simply referred to Alderton leading a 'Board hygiene' discussion involving 'various resolutions' without specifying what was proposed."[150] Further, the Bäckers argue that "Alex asking the CEO to circulate resolutions was not an affirmative misrepresentation that Alex and Ricardo wanted Grauman on the Board or assumed Grauman had already joined the Board."[151]

Regarding the second misrepresentation, the Bäckers argue that

> Alex's use of the pronouns 'we' and 'our' in an email copying the Board and asking the CEO to circulate materials was not an affirmative misrepresentation that Alex and Ricardo wanted Grauman on the Board or assumed Grauman had already joined the Board. Grauman, as the requested distributor of the materials, already had the Board materials and thus was not part of the collective 'we' that needed to do 'our' homework before the Board meeting.[152]

---

[149] *Id.* at \*10 n.116 (quoting A301).
[150] Opening Br. 31.
[151] *Id.*
[152] *Id.* at 31-32.

Regarding the third misrepresentation, the Bäckers argue that "Alex did not expressly or implicitly request 'Board resolutions that would formalize Grauman's appointment to the board.'" Further, "Alex and Ricardo's failure to specifically object to a draft proposed resolution prior to the November 15 Meeting was not an affirmative misrepresentation that [they] wanted Grauman on the Board or assumed Grauman had already joined the Board."[153]

Regarding the fourth misrepresentation, the Bäckers argue that "Alex saying to a former director no longer subject to confidentiality [that] [Alex's] relationship with Grauman was 'fine' was not an affirmative misrepresentation that Alex and Ricardo wanted Grauman on the Board or assumed that Grauman had already joined the Board. Alex's dissatisfaction with Grauman was clear enough that Markman believed when he resigned that Alex 'would try to reinstate himself as CEO.'"[154]

On reply, the Bäckers further argue that

> [t]he timeline of deception relied upon by the Court of Chancery . . . does not hold up. It was not until *after* Markman's resignation . . . that Alex prepared resolutions for the November 15 Meeting. All but one communication the Court of Chancery found to be deceptive *preceded* Markman's resignation. . . .
>
> . . . .
>
> The only communication after Markman's resignation was Alex's request of Grauman, the CEO, who prepared Board materials, to circulate materials for the meeting 'so that we may all do our homework and be prepared to spend our time together most productively.' There is no evidence that this email gave

---

[153] *Id.* at 32.
[154] *Id.* at 30 (quoting *Palisades*, 2020 WL 1503218, at *5).

Anderson the 'impression that [Alex] Bäcker approved of Grauman's Board membership,' nor could it have reasonably given such an impression.[155]

The Bäckers' arguments are unpersuasive because they fail to demonstrate that the Court of Chancery's factual findings were wrong, let alone clearly erroneous. For example, it was not unreasonable to find that Alex's request that Grauman "circulate any proposed resolutions" created the impression that Alex "had no issue with Grauman joining the Board."[156] Asking Grauman to circulate resolutions implied that Grauman would have a meaningful role at the November 15 board meeting.

Similarly, Alex's statement to Nam that "everything was fine" between Alex and Grauman implied—if not outright stated—that Alex continued to support Grauman as the CEO. If everything was fine, Alex would have had no reason to fire Grauman. Thus, this statement also implied support for Grauman's continued status as CEO, even if it did not outright express support for Grauman's nomination to the board.

The Bäckers' timing argument suffers from similar problems. It may be true that the Bäckers did not begin working on a counter agenda until Markman resigned. But it is also true that Markman resigned "after a phone call with [Alex] Bäcker that led Markman to believe [Alex] Bäcker would try to reinstate himself as CEO."[157] Thus, the record suggests that Alex's intent to fire Grauman predated and caused Markman's resignation.

---

[155] Reply Br. 8, 10.
[156] *See Palisades*, 2020 WL 1503218, at * 10.
[157] *Id.* at *5.

33

The bigger problem for the Bäckers, however, is that the Court of Chancery identified at least one misrepresentation that passes muster under all of the requirements that the Bäckers suggest. On the day before the contested board meeting—and hours *after* Markman resigned—Alex asked Grauman to circulate board materials "so that *we* may all do *our* homework and be prepared to spend *our* time together most productively."[158]

This was an affirmative statement. Alex made the statement *after* Markman resigned. And the statement was deceptive and misleading on its face. At that point, Alex knew that he held a board majority, and Alex had left Markman with the impression that he wanted to fire Grauman. Therefore, Alex must have known that the draft resolutions Alderton circulated earlier in the week were now a dead letter. Nonetheless, Alex asked that Grauman share his draft resolutions with Anderson and others "so that we may all do our homework."[159] There was no reason for Grauman to prepare for a meeting from which he would be excluded and at which he would be fired. And there was no reason for Anderson or Grauman to study resolutions that Alex knew the board would not consider. It is not erroneous to find that this statement was deceptive.

The Bäckers try to blunt this argument by claiming that Alex's use of the words "our" or "we" did not refer to Grauman.[160] Even if this reading is plausible, the Bäckers fail to explain why the Court of Chancery's interpretation was unreasonable, let alone clearly

---

[158] *Id.* at *10.
[159] *Id.*
[160] Opening Br. 31-32.

erroneous. It would not be unreasonable to find that "our" and "we" referred to all of the recipients who expected to meaningfully participate in the meeting, including Grauman.

We therefore hold that the Court of Chancery's finding of affirmative deception was not clearly erroneous.

The Bäckers raise two more arguments that we must address before concluding this section. First, the Bäckers argue that "[t]he Court of Chancery erred by holding that Alex caused Anderson's attendance at the November 15 Meeting."[161] Instead, the Bäckers claim that it was Alderton's legal advice that Anderson "and D'Addario held two votes—enough to block Alex and Ricardo's votes—that led [Anderson] to attend and remain for the entire meeting,"[162] not misrepresentations from the Bäckers.

At best, the Bäckers raise the possibility that multiple factors contributed to Anderson's decision to attend the November 15 meeting. It is possible that Anderson decided to attend the meeting based on Alderton's legal advice. But it is also possible that Alderton's legal advice and Anderson's decision to attend the meeting relied on misrepresentations from the Bäckers that they supported the board's original agenda, which included appointing both D'Addario and Grauman to the board. That agenda would have prevented the Bäckers from taking unilateral action. Because the Court of Chancery's choice between two permissible views of the evidence cannot be clearly erroneous,[163] we hold that

---

[161] *Id.* at 38.
[162] *Id.* at 39.
[163] *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015).

the court's conclusion that the Bäckers secured a quorum by deceiving Anderson was not clearly erroneous.

Second, the Bäckers argue that because the Court of Chancery held that "there was no deceptive action related to the appointment of the Series A-1 director [D'Addario] in advance of the November 15 meeting,"[164] the court erred by finding deception as to Grauman's appointment.

We disagree. The Court of Chancery did not commit clear error by finding deceptive conduct as to Grauman's appointment but not D'Addario's appointment. This argument ignores the distinction between the court's determination that the Bäckers did not prevent Altos from exercising its rights and the court's broader determination that the Bäckers nonetheless acted inequitably. Further, this argument ignores that the Court of Chancery identified misrepresentations that treated Grauman's nomination differently from D'Addario's nomination. For example, Alex's statement to Nam that "everything was fine" between Alex and Grauman implied support for Grauman's nomination but was silent with regards to D'Addario.[165] Similarly, the multiple correspondences between Alex and Grauman ahead of the November 15 meeting created an impression that Grauman would have a meaningful role at the meeting.[166] On the other hand, Alex's suggestion that Nam

---

[164] Opening Br. 24.
[165] *See Palisades*, 2020 WL 1503218, at *10 n.116.
[166] *See id.* at *10.

consider someone other than D'Addario cast some doubt on Alex's support for D'Addario's appointment but was silent with regards to Grauman.[167]

Thus, the Court of Chancery did not commit clear error by finding that the Bäckers deceived Anderson by falsely representing support for Grauman's appointment despite finding that the Bäckers did not inequitably interfere with Altos's right to appoint D'Addario as the replacement Series A-1 director.

### 3.     Palisades raised deception as to Grauman's appointment

The Bäckers next contend that "Palisades never argued below that Alex and Ricardo affirmatively deceived Anderson into believing that Grauman would be appointed as the CEO Director."[168]   Instead, the Bäckers claim that Palisades raised below a theory of deception that focused exclusively on D'Addario's appointment.[169]  Thus, the Bäckers argue that they were denied "a fair opportunity to respond" because the Court of Chancery granted equitable relief "divorced from any theory advanced by Palisades . . . .  Had [the Bäckers] known that they would be accused of affirmatively deceiving Anderson into believing [the Bäckers] would support Grauman's appointment, [the Bäckers] could have tried the case differently."[170]

---

[167] *See, e.g.*, A202-03.
[168] Reply Br. 13.
[169] Opening Br. 35-37; Reply Br. 13-15.
[170] Opening Br. 37.

The Bäckers rely on *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.* to support their waiver argument. In *Aruba*, this Court rejected the Court of Chancery's "use [of] the trading price . . . for determining fair value" after finding that such an approach was "not grounded in the record" because neither party raised the theory, and the approach was therefore not "subjected to the crucible of pretrial discovery, expert depositions, cross-expert rebuttal, expert testimony at trial, and cross examination at trial."[171] In other similar circumstances, the Court of Chancery has rejected arguments that a party failed to raise before trial on the basis that the opposing party may have tried the case differently given notice of the new argument.[172]

Although the deception theory that Palisades raised below focused on D'Addario's appointment, we disagree with the Bäckers' argument that they were denied a fair opportunity to respond to a theory of deception as to Grauman's appointment. Palisades has consistently argued that the Bäckers deceived their fellow directors by representing support for the board's original agenda while concealing a secret counter-agenda to seize control of the company.[173] The board's original agenda would have appointed Grauman to the CEO-

---

[171] 210 A.3d 128, 133-34, 139 n.58, 140 (Del. 2019).

[172] *See HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *1, *41 (Del. Ch. May 19, 2020); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *22 n.117 (Del. Ch. Aug. 18, 2006).

[173] *See, e.g.*, A317 (in its complaint, Palisades alleged that "[h]aving ambushed the meeting and manufactured a false majority, Alex Bäcker then proceeded to purport to 'pass' a number of invalid resolutions . . . "); B131, at 10:9-13 (at a hearing held before the trial, counsel for Palisades argued that "it was everyone's understanding going into the November 15th meeting that . . . Mr. Grauman would be confirmed as the CEO director . . .").

director seat.[174] The Bäckers' counter agenda hinged on firing Grauman and appointing Alex to the CEO-director seat.[175] Thus, the Bäckers had ample notice that Palisades claimed that the Bäckers had falsely represented support for an agenda that, among other things, would have appointed Grauman to the Company's board.

Further, unlike in *Aruba*, the Bäckers had the opportunity to explore deception as to Grauman's appointment. Grauman's appointment was the subject of discovery requests[176] and deposition testimony.[177] Palisades also noted in its pretrial brief that

> as recently as November 12, [Alex] Bäcker spoke to Nam and did not raise any issues regarding Mr. D'Addario's appointment. Neither did Bäcker indicate to Nam in response to his specific questioning that there were any issues with Grauman's performance as CEO, which has now become Defendants' pretextual justification for their November 15 actions.
>
> Despite the lack of any previous indication to the contrary, the Bäckers' actions during the November 15 Meeting deviated

---

[174] *See, e.g.*, A263 ("The Board Consent does the following . . . [r]atifies the appointment of Kevin Grauman as EO [sic], . . . and appoints him to serve as the CEO Director . . . .").

[175] *See, e.g.*, A248-51 (email thread discussing the Bäckers' secret counter-agenda for the November 15 board meeting).

[176] *See, e.g.*, B180 (Palisades requesting "[a]ll documents and communications concerning Kevin Grauman's performance as the Chief Executive Officer of the Company, and "[a]ll documents and communications concerning Kevin Grauman's purported termination on November 15, 2019"); B191 (requesting that the Bäckers "[i]dentify all documents and information supporting Your refusal to vote for, consent to, appoint, or otherwise recognize Kevin Grauman as the CEO Director . . . "); B198 (the Bäckers requesting "[a]ll documents and communications concerning Kevin Grauman").

[177] *See, e.g.*, A739-40, at 248:24-249:10 (Testimony from Nam's deposition: "Q. Did Alex Bäcker inform you on your November 12th call with him or at any other time in advance of the November 15th meeting that he was contemplating replacing Mr. Grauman as C.E.O. with Himself? A. No. Definitely not. Q. Did Alex Bäcker inform you on your November 12th call with him or at any other time in advance of the November 15th meeting that he was dissatisfied with Mr. Grauman's performance as C.E.O.? A. No. And on that particular point, now that you mention it, I specifically remember I asked him a very direct question.").

entirely from the circulated board resolutions and agenda. Not only did the Bäckers refuse to recognize D'Addario, they purported to fire Grauman as CEO and appoint Bäcker to that position (and CFO).[178]

This passage gave the Bäckers notice that Palisades linked its deception theory to Alex's false support for Grauman. We therefore hold that the Court of Chancery did not err by granting equitable relief on the basis that the Bäckers falsely represented support for the original board resolutions that, among other things, would have appointed Grauman to the board.

## B. The Court of Chancery Did Not Impose an Equitable Notice Requirement for a Regular Board Meeting

The Court of Chancery held that "keeping mum as [Alex and Ricardo] planned their ambush was inequitable" because "[i]f Anderson had known of Defendants' change of plans, he would have refused to participate in the meeting, defeating a quorum and thwarting the coup."[179] Relying on the assumption that the Bäckers did not deceive Anderson, the Bäckers reason that the court effectively imposed an equitable notice requirement by faulting the Bäckers for choosing not to speak and disclose their true agenda to Anderson.[180] The Bäckers also argue that "[a]ll the evidence showed that the November 15 Meeting was a regular meeting, except for one errant reference to a special meeting in Alderton's draft

---

[178] A1245-46.
[179] *Palisades*, 2020 WL 1503218, at *10.
[180] Opening Br. 41-43.

40

minutes."[181] Combining these premises, the Bäckers contend that the Court of Chancery erred by imposing an equitable notice requirement on a regular board meeting, contrary to this Court's holding in *Klassen*, which rejected a notice requirement for regular board meetings.[182]

Delaware law does not require that board members receive notice of the agenda related to regular board meetings. For example, in *Klassen*, this Court held that

> [i]t is settled Delaware law that corporate directors are not required to be given notice of regular board meetings. There being no such notice requirement, it follows that there is no default requirement that directors be given advance notice of the specific agenda items to be addressed at a regular board meeting.[183]

Thus, this Court in *Klassen* held that the *Koch*, *Adlerstein*, and *Fogel* decisions were inapposite because "in those cases the disputed board actions occurred at special—not regular—board meetings."[184] Contrastingly, special meetings often require notice, and Delaware courts have used false or misleadingly incomplete special meeting notices to invalidate inequitable board actions.[185]

As Palisades correctly notes, "the Court of Chancery never decided whether the November 15 Meeting was a regular meeting or a special one," and Alderton's minutes from

---

[181] *Id.* at 42 (citing A1413-18).

[182] *Id.* at 41-43.

[183] 106 A.3d at 1043-44 (citations omitted).

[184] *Id.* at 1044-45.

[185] *See, e.g.*, *Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978, at *1, *4 (Del. Ch. Dec. 13, 2007); *Koch*, 1992 WL 181717.

the meeting "state[] that the Meeting was a special one."[186] Regardless, the type of meeting is immaterial because the source of inequity is not the lack of notice, but the Bäckers' decision to secretly plan an ambush after feigning support for the planned governance items. Stated differently, contrary to the Bäckers' suggestion, the Court of Chancery did not impose an equitable notice requirement by faulting the Bäckers for staying silent. Instead, the court faulted the Bäckers for choosing to speak and mislead their fellow directors. Most notably, shortly before the November 15 board meeting Alex asked Grauman to "please distribute the board materials/deck a day in advance of the meeting so that we may all do our homework and be prepared to spend our time together most productively[.]"[187]

This statement was deceptive. There was no reason for the other directors to consider resolutions that the Bäckers knew that the board would not consider, and there was no reason for Grauman to prepare for a board meeting at which he would be excluded and fired. Thus, the court did not impose an equitable notice requirement by faulting the Bäckers for their silence. The court granted equitable relief because the Bäckers made misrepresentations designed to deceive their fellow directors.

---

[186] Answering Br. 39 (citing A1413-18) (emphasis removed).
[187] *Palisades*, 2020 WL 1503218, at *10; A207.

## C.    Anderson's Attendance and Actions at the November 15 Board Meeting Do Not Preclude Equitable Relief

The Bäckers argue that even if they deceived Anderson, the Court of Chancery erred by invalidating the board actions as a matter of equity for two reasons.  First, the Bäckers argue that the "*Koch* rule" against deception "applies only to special meetings, not regular meetings like the November 15 board meeting. . . .  A director cannot be deceived into attending a regular meeting for purposes of voiding action taken at the meeting."[188]  The Bäckers rely on *Klassen*'s rejection of an advance notice requirement for regular board meetings to support this argument.[189]

We disagree with the Bäckers' suggestion that equity provides no remedy where a director has the misfortune of being tricked into attending a regular, as opposed to special, board meeting.  Although *Koch* addressed deception regarding a special board meeting, the Court of Chancery's holding relied on the broader principle that where a director "was tricked or deceived into attending [a board] meeting . . . the general rule is that actions taken at such a meeting are void."[190]  Subsequent opinions invalidating board actions tainted by deception have taken a similarly broad approach.[191]  Nothing in these opinions suggests that

---

[188] Opening Br. 44-45.

[189] *See id.* (citing *Klassen*, 106 A.3d at 1044).

[190] 1992 WL 181717, at *4 (citing *Schroder v. Cotton, Dillon Co.*, 299 A.2d 431, 436 (Del. Ch. 1972)).

[191] *See, e.g.*, *OptimisCorp v. Waite*, 137 A.3d 970, 2016 WL 2585871, at *3 (Del. Apr. 25, 2016) (Table) ("We are reluctant to accept the notion that it vindicates the board's right to govern the corporation to encourage board factions to develop Pearl Harbor-like plans to address their concerns . . . .  Rather, it has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material

Delaware law tolerates deception related to regular board meetings, and we can think of no good reason why deception would be allowed for regular board meetings, but forbidden for special board meetings.

*Klassen* does not save the Bäckers' argument. Contrary to the Bäckers' assertions, *Klassen* does not hold that equitable relief is unavailable where a director is tricked into attending a regular board meeting. Instead, the Court held more narrowly that because "[i]t is settled Delaware law that corporate directors are not required to be given notice of regular board meetings," the board's actions were not automatically invalid where the CEO-director "received no advance notice that his possible termination would be considered at that [regular board] meeting."[192] Rejecting an advance notice requirement for regular board meetings did not grant parties a license to deceive. To the contrary, the Court was careful to note—in a case regarding a *regular* board meeting—that "[o]ur courts do not approve the use of deception as a means by which to conduct a Delaware corporation's affairs, and nothing in this Opinion should be read to suggest otherwise."[193]

---

information."); *Fogel v. U.S. Energy Sys.*, 2007 WL 4438978, at *3 (Del. Ch. Dec. 13, 2007) ("Where a director is tricked or deceived about the true purpose of a board meeting, and where the director subsequently does not participate in that meeting, any action purportedly taken there is invalid and void." (citing *Koch*, 1992 WL 181717, at *4)); *Alderstein v. Wertheimer*, 2002 WL 205684, at *8 (Del. Ch. Jan. 25, 2002) (invalidating a board action where other directors coordinated to keep the CEO-director "deliberately uniformed about their plan to present" a proposal that would dilute the CEO's ownership stake at a board meeting); *Schroder*, 299 A.2d 431, 436 (Del. Ch. 1972) ("A quorum obtained by trickery is invalid, and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held." (citation omitted)).

[192] 106 A.3d at 1043 (citation omitted).
[193] *Id.* at 1046.

We therefore reject the Bäckers' argument that directors cannot be tricked into attending regular board meetings. Regardless of the type of meeting or form of communications, Delaware law does not countenance deception designed to manufacture a quorum or otherwise induce director action. As this Court recognized in *City of Fort Myers General Employees' Pension Fund v. Haley*, "[i]t is elementary that under Delaware law the duty of candor imposes an unremitting duty on fiduciaries, including directors and officers, to 'not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations.'"[194] This principle applies with equal force to regular and special board meetings.

Second, the Bäckers argue that even if equitable relief was appropriate because the Bäckers deceived Anderson, his "thorough participation precludes invalidation. . . . '[W]here the deceived director remains at the meeting and participated throughout' the action taken at the meeting is not void or voidable.'"[195] Relying on *Koch*, which states that "[n]otwithstanding any deceit that may have been involved in calling a meeting, the actions taken will not be invalidated where the deceived director remains at the meeting and participates throughout . . . ,"[196] the Bäckers argue that Anderson's decision to stay at the

---

[194] 235 A.3d 702, 718 (Del. 2020) (quoting *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989)).
[195] Opening Br. 45-46 (quoting *Klassen*, 2013 WL 5967028, at *8).
[196] 1992 WL 181717, at *5 (citation omitted).

45

November 15 board meeting and vote against the Bäckers' actions precludes equitable relief.[197]

The trouble with the Bäckers' argument is that they did not properly raise a participation defense before the Court of Chancery. The Bäckers point to arguments that Palisades raised throughout the proceedings below regarding Anderson's participation,[198] but those citations are unavailing. Palisades did not raise any equitable *defenses* that would defeat its own claims, and the passages that the Bäckers cite do not address the disputed issues underlying an equitable participation defense, such as whether the Bäckers' deception disabled Anderson from meaningfully participating in the meeting.

The Bäckers also assert that their March 12, 2020 post-trial memorandum raised a participation defense by arguing that

> [e]ach of Palisades's arguments depends on the November 15 meeting being special and notice therefore being required. None apply to a regular meeting. Each of *Klassen*, *Fogel*, *Schroder*, *Alderstein* and *Kalisman* involved special meetings and Palisades simply repeats its arguments that silence is deception. Those arguments fail for the reasons already briefed. Further, Palisades fails to grapple with the next step in its deception argument. "[W]here the deceived director remains at the meeting and participates throughout" the action taken at the

[197] Opening Br. 44-46.

[198] *See, e.g.*, Reply Br. 18 ("Palisades rested its case below on the premise that Anderson and D'Addario fully participated in the November 15 Meeting and, as a result, the votes were 2-2) (citing A1226, 1231-32 (Palisades arguing in its pretrial brief that the Bäckers' actions were invalid because they should have recognized D'Addario's appointment to the board, and both Anderson and D'Addario voted against all of the proposals that the Bäckers purported to pass during the meeting)).

meeting is not void or voidable. Anderson remained and participated throughout the meeting.[199]

But if Anderson's participation "was the cornerstone of Palisades's claims below,"[200] the Bäckers fail to explain why they waited until the last possible instant—*after* discovery had closed, depositions were complete, the parties submitted pre-trial briefs, the court held a paper trial, and the parties completed their first round of post-trial briefing—to unveil a participation defense. At that late hour, Palisades did not have an opportunity to respond to the Bäckers' participation argument, could not gather new evidence, and could not adjust its trial strategy to account for a new equitable defense.

It is also unclear that the Bäckers' passing reference to Anderson's participation properly raised a participation defense. The Court of Chancery did not think that the Bäckers raised any equitable defenses,[201] and the Bäckers only mentioned Anderson's participation in the context of addressing a separate legal issue: whether a director can be deceived into attending a regular board meeting. The Bäckers also failed to address the substance of a participation defense, such as whether Anderson could meaningfully participate given the Bäckers' deception.

---

[199] A1416-17 (quoting *Klassen*, 2013 WL 5967028, at *8); *see also* Opening Br. 44 (claiming that A1416-17 preserved this issue).
[200] Reply Br. 19.
[201] *Palisades*, 2020 WL 1503218, at *10 n.123.

Accordingly, we hold that the Bäckers waived their argument that Anderson's participation precluded equitable relief. Because we decide this issue on waiver grounds, we do not reach the merits of a participation defense.

### D. The Court of Chancery Did Not Provide Extracontractual Relief under the Voting Agreement

The Bäckers argue that because "it was Alex and Ricardo's actions related to the Voting Agreement that led to the Court of Chancery's equitable invalidation," the court erred by using its equitable powers to grant Palisades extracontractual relief not available under the voting agreement.[202] Further, the Bäckers argue that "[t]he Court of Chancery erred by imposing an equitable remedy despite declining to find a breach of the Voting Agreement."[203]

The Bäckers' rely on the Court of Chancery's holding in *Nemec v. Shrader* that "where a dispute 'relate[s] to obligations "expressly treated . . ." by contract[, it] will be governed by contract principles.' If the 'fiduciary claims relate to obligations that are expressly treated' by contract[,] then this Court will review those claims as breach of contract claims and any fiduciary duty claims will be dismissed."[204] Put differently,

---

[202] Opening Br. 47.
[203] Reply Br. 23.
[204] 2009 WL 1204346, at *4 (Del. Ch. Apr. 30, 2009) (quoting *Madison Realty Co. v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del.Ch. Apr. 17, 2001)), *aff'd*, 991 A.2d 1120 (Del. 2010) ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." (citations omitted)).

> the general rule under Delaware law, subject to only narrow exceptions, is that a plaintiff may not 'bootstrap' a breach of fiduciary duty claim into a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty. Courts will dismiss the breach of fiduciary [duty] claim where the two claims overlap completely and arise from the same underlying conduct or nucleus of operative facts.[205]

This bootstrapping case law only requires dismissal where a fiduciary duty claim wholly overlaps with a concurrent breach of contract claim. For example, in *Schuss v. Penfield Partners*, the Court of Chancery refused to dismiss breach of fiduciary duty claims that "share[d] a common nucleus of operative facts with [the] Plaintiffs' breach of contract claim" because the breach of fiduciary duty claims "depend[ed] on additional facts [that were] . . . broader in scope and involve[d] different considerations in terms of a potential remedy" than the concurrent breach of contract claims.[206] In reaching this conclusion, the court noted that "this case is distinguishable" from cases applying Delaware's bootstrapping doctrine "which dismissed breach of fiduciary duty claims as duplicative of breach of contract claims that either were substantially identical, such that the fiduciary duty claim would have been 'superfluous,' or involved remedies that were likely to be equivalent."[207] Similarly, in *In re Mobilactive Media, LLC*, the Court of Chancery "reject[ed] the

---

[205] *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) (citing *Schuss v. Penfield P'rs*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008); *Madison Realty*, 2001 WL 406268, at *5; *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998)).
[206] 2008 WL 2433842, at *10.
[207] *Id.* (quoting *Gale*, 1998 WL 118022, at *5).

Defendants' characterization of [the Plaintiff's] fiduciary duty claim as duplicative" because "the remedies for breach of contract and breach of fiduciary duty in this case are different."[208]

Contrary to the Bäckers' arguments, the Court of Chancery did not grant equitable relief for a breach of the voting agreement. The court granted equitable relief on the basis that the Bäckers—acting in their capacities as *directors*—deceived Anderson to create a quorum for the November 15 board meeting.[209] The subject matter of the voting agreement may have overlapped with the Bäckers' inequitable conduct, but the court's equitable award addressed harm flowing from the Bäckers' deceptive conduct in their capacities as directors, not from a breach of contract in their capacities as stockholders and parties to the voting agreement.

Thus, the Court of Chancery did not err by exercising its equitable powers to grant relief for a *de facto* breach of the voting agreement. The court granted equitable relief for the harm flowing from the Bäckers' breach of their equitable duties as directors. Because this claim involved facts separate from a breach of contract claim, and sought a different remedy,

---

[208] 2013 WL 297950, at *20 n.219 (Del. Ch. Jan. 25, 2013) (citing *Schuss*, 2008 WL 2433842, at *10); *see also Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005, at *6 n.57 (May 31, 2019) ("The fiduciary duty claims are grounded in additional distinct facts . . . . Thus, the claims are not duplicative."); *2009 Caiola Family Tr. v. PWA, LLC*, 2014 WL 7232276, at *9 (Del. Ch. Dec. 18, 2014) ("While some of the factual allegations supporting Plaintiffs' breach of fiduciary duty claims overlap with those related to their breach of contract claims, the potential breaches of fiduciary duty are broader in scope than, and therefore not precluded by, the terms of the Operating Agreement.").
[209] *See Palisades*, 2020 WL 1503218, at *9-10.

Delaware's bootstrapping case law is inapposite and did not require that the Court of Chancery dismiss Palisades's request for equitable relief.

## IV. CONCLUSION

Based on the foregoing, the Court of Chancery's March 26, 2020 Memorandum Opinion is AFFIRMED.